# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

JAMES RUSSELL TODD,    )
            )
    **Plaintiff,**    )
            )  **Civil Action No. 3:05-0983**
    **v.**       )  **Judge Wiseman / Knowles**
            )
JO ANNE BARNHART,    )
**Commissioner of Social Security** )
            )
    **Defendant.**   )

## REPORT AND RECOMMENDATION

  This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff

was not disabled and denying Plaintiff Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI"), as provided under the Social Security Act ("the Act"), as amended.

The case is currently pending on Plaintiff's "Memorandum Brief," which the undersigned will

construe as a Motion for Judgment on the Administrative Record.  Docket Entry No. 10.

Defendant has filed a Response, arguing that the decision of the Commissioner was supported by

substantial evidence and should be affirmed.  Docket Entry No. 13.

  For the reasons stated below, the undersigned recommends that Plaintiff's Motion for

Judgment be DENIED, and that the decision of the Commissioner be AFFIRMED.

## I.  INTRODUCTION

  Plaintiff filed his applications for DIB and SSI on November 22, 2002, alleging that he

had been disabled since September 15, 2002, due to injury to his lower back and spine.  Docket

1

Entry No. 10, Attachment ("TR"), TR 68. Plaintiff's applications were denied both initially (TR 33) and upon reconsideration (TR 39). Plaintiff subsequently requested (TR 41) and received (TR 21-26) a hearing. Plaintiff's hearing was conducted on February 16, 2005 by Administrative Law Judge ("ALJ") Robert C. Haynes. TR 275. Plaintiff and vocational expert ("VE"), Gail Ditmore, appeared and testified. TR 275-276; 298.

On July 1, 2005, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 10-19. Specifically, the ALJ made the following findings of fact:

1    The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3    The claimant's degenerative disc disease and post surgical epidural fibrosis are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(c).

4    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5    The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6    The claimant has the following residual functional capacity: a limited range of medium work.

7    The claimant's past relevant work as tree trimmer helper, saw mill worker, and tow motor operator, either as performed by the claimant or as stated in the DOT, and the medium unskilled laborer position as performed are not precluded by his residual functional capacity (20 CFR §§

2

404.1565 and 416.965).

> 8   The claimant's medically determinable degenerative disc disease and post surgical epidural fibrosis do not prevent the claimant from performing his past relevant work.

> 9   The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR §§ 404.1520(f) and 416.920(f)).

TR 18-19.

On July 1, 2005, Plaintiff timely filed a request for review of the hearing decision. TR 7.

On September 17, 2005, the Appeals Council issued a letter declining to review the case, thereby

rendering the decision of the ALJ the final decision of the Commissioner. TR 4. This civil

action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. §§ 405(g) and

1383(c)(3). If the Commissioner's findings are supported by substantial evidence, based upon

the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

### A. Medical Evidence

Plaintiff alleges disability due to injury to his lower back and spine. TR 68.

On June 9, 1996, Plaintiff visited Stones River Hospital Emergency Room.[1] TR 164.

Then on May 1, 1998, Plaintiff was evaluated by Dr. Brad Blankenship at St. Thomas

Cardiology Group for a history of "four episodes of syncope." TR 105. Plaintiff believed that

the first time he passed out it was "secondary to ETOH abuse." *Id.* Dr. Blankenship believed

that the second time Plaintiff passed out was the result of a "vasovagal epidsode where he got

dizzy after going to the bathroom while under a lot of stress and undergoing a divorce from his

wife." *Id.* Plaintiff's most recent spell was a "couple of weeks" before the appointment, and

---

[1]The record from this visit is illegible. TR 164.

3

Plaintiff said he felt "weak," "dizzy" and "shaky inside." *Id.* Plaintiff went on to say that he did "not know how long he was out" and that he "couldn't feel his body." *Id.* After the seizure, Plaintiff stated that he was lightheaded, had no balance, and "was unsteady for about 30 minutes." *Id.* Dr. Blankenship stated that he was not sure of the etiology of his spells but that the most recent episode may be neurological. TR 106. He recommended that Plaintiff see a neurologist. *Id.*

On August 15, 2000, Plaintiff visited Stones River Hospital and was treated by Dr. George J. Childs for a "mass effect present to the left scrotal area." TR 163. Plaintiff had been treated with antibiotics which were unsuccessful. *Id.* Dr. Child's impression was that Plaintiff had a "mass effect to left scrotal area with some mild irritation to the skin" and "No evidence of infection or abscess formation." *Id.*

Plaintiff visited Stones River Emergency Room on November 27, 2000 for finger trauma. TR 162.

On January 29, 2001, Plaintiff was treated by Dr. Jeffrey Webber at Frist Cardiology for "nagging substernal chest pain which increases with inspiration." TR 134. Dr. Webber reported that Plaintiff had a "recent upper respiratory tract infection" and that his pain was "notably worse" when at rest. *Id.* Dr. Webber concluded that the chest pain was "atypical for myocardial ischemia" and that the pain was "related to his upper respiratory tract infection recently." TR 135. Also, Dr. Webber did not believe that "pulmonary embolism" was the cause of the pain. *Id.* Plaintiff was put on a trial of ibuprofin and "Bactrim DS" and instructed to return for an exercise treadmill test if symptoms did not improve. *Id.*

On February 5, 2001, Plaintiff underwent an exercise treadmill test at Stones River Hospital that was ordered by Dr. Webber. TR 136. Plaintiff demonstrated "fair exercise

4

tolerance." *Id.* Plaintiff did not demonstrate any "clinical manifestations of myocardial ischemia with exercise," any "electrocardiographic evidence for myocardial ischemia," or any "arrhythmias." *Id.* Plaintiff's physical examination was "rather unremarkable" and his chest pain was "likely noncardiac." TR 133. Dr. Webber told Plaintiff that he "needs no further cardiac evaluation at this time." *Id*

On September 28, 2002, Plaintiff went to the emergency room for back pain complaining that his back "popped." TR 161.

On December 2, 2002, Plaintiff was treated by Dr. William D. Layman at Stones River Hospital for right ankle pain. TR 160. Dr. Layman noted "Small exostosis at the anterior aspect of the tibia probably represent the sequela of prior ligamentous injury." *Id.*

On December 10, 2002, Plaintiff was treated by Dr. Blankenship at Stones River Hospital for ankle pain. TR 160. Dr. Blankenship found no fractures, destructive bony lesions, or joint space narrowing. *Id.*

On December 19, 2002, Plaintiff was evaluated by Dr. Luis Portilla for "dyspnea on exertion," "a cough that is productive of yellow sputum," and "one episode of hemotypsis about a year ago." TR 108. Dr. Portilla found that Plaintiff had chronic obstructive pulmonary disease, a history of tobacco use, cardiomegaly, and dyspnea. TR 109. Plaintiff was scheduled for a pulmonary function test and was prescribed "Combivent." *Id.* Plaintiff was also advised to quit smoking, and an echocardiogram was recommended. TR 109-110.

Plaintiff visited Stones River Hospital on January 3, 2003 to have a diagnostic imaging report done for his cardiomegaly. TR 204. Dr. Webber found that Plaintiff had a normal aortic valve with "minor mitral valve leaflet thickening with adequate opening and trace mitral regurgitation." *Id.* Additionally, Plaintiff had a normal left and right ventricular cavity size. *Id.*

5

On January 9, 2003, Plaintiff returned to Dr. Webber at the Cardiology Clinic for chest pain. TR 132. Plaintiff stated that he felt "like something was stepping on [his] chest." *Id.* Dr. Webber characterized Plaintiff's pain as "atypical chest pain" and scheduled an "adenosine sestamibi scan." *Id.* Plaintiff's EKG revealed "sinus bradycardia with a nonspecific intraventricular conduction delay." *Id.*

On February 21, 2003, Plaintiff saw Dr. Seyed M. Emadian at Premier Neurosurgery & Spine Center, P.C. for complaints of "low back pain radiating to the right greater than left lower extremity." TR 153-155. Plaintiff's primary diagnosis was "lumbago and lumbar radiculopathy" and his differential diagnosis was "myofascial syndrome, facet syndrome, neuropathy and plexopathy." TR 155. Plaintiff chose to "proceed with a lumbar epidural steroid block for symptomatic treatment." *Id.*

Dr. Don Arms of the McMinnville Orthopaedic Clinic treated Plaintiff on January 28, 2003 for his left ankle pain. TR 111. Dr. Arms, however, did not have an explanation for the pain as there were no episodes of trauma, x-rays were benign and his physical exam was normal. *Id.* Dr. Arms explained: "He does not have any evidence of cartilage injury on his x-ray, tendon subluxation, or instability on exam." *Id.* Dr. Arms recommended a light brace and non-habit forming medications. *Id.*

On March 24, 2003, Plaintiff visited Southern Tennessee Cancer Center and was evaluated by Dr. Henry J. Goolsby, III for "leukocytosis." TR 113. Plaintiff was diagnosed with "Leukocytosis, asymptomatic without significant history of toxic chemical or family history of hematologic disorders" and "Incidental finding of possible claudication." TR 113-114. Plaintiff returned on April 3, 2003 for a follow-up evaluation with Dr. Goolsby. TR 112. Dr. Goolsby concluded that "his leukocytosis is secondary to his steroid intra-articular injection." *Id.*

6

Additionally, Plaintiff was instructed to obtain a CBC and return in one month for a follow-up appointment. *Id.*

Plaintiff received a consultative examination by Dr. Donita Keown of the DDS on March 26, 2003. TR 117. Dr. Keown found that Plaintiff "most likely has much better range of motion in the lumbar spine than what he wishes to depict today." TR 118. Furthermore, Dr. Keown found that Plaintiff has "no evidence of diminished motor strength in the lower limbs." *Id.* The findings of the study indicate showed:

> L5 is somewhat transitional. There is narrowing of the L5-S1 disc space. Short ribs are present on T12. The pedicles and posterior spinous processes appear intact. Minimal degenerative changes are present in the endplate.

TR 119.

On April 16, 2003, Plaintiff vistited the Sinus and Allergy Center at the Marvel Clinic with "ringing in his ears and hearing loss more prominent." TR 120. He was treated by Dr. Richard C. Weis who found that Plaintiff had "mild noise induced hearing loss" and recommended that Plaintiff use ear plugs and "sustain [*sic*] from very significant noise exposure." *Id.*

Again on April 17, 2003, Plaintiff saw Dr. Emadian for complaints of "low back pain radiating to the right hip and thigh." TR 150. Plaintiff stated that some relief resulted from rest and medication. *Id.* Dr. Emadian's primary diagnosis was "lumbago and lumbar radiculopathy secondary to L2,3 degenerative disc disease." TR 151. Plaintiff decided to have a second epidural steroid block. *Id.*

On April 22, 2003, Plaintiff underwent an analysis by DDS Medical Consultant Dr. George W. Bounds. TR 121. Dr. Bounds found that Plaintiff's "Physical impairment(s) [were]

7

not severe, singly or combined," and that his "pain complaint [was] not credible even by combination effect." TR 121. Dr. Bounds indicated that Plaintiff gave a poor effort during the examination. *Id.*

Plaintiff visited the Murfreesboro Dermatology Clinic on April 29, 2003 for an "evaluation of non-healing lesions to his forearm." TR 122. He was treated by Angela D. Higgins, PA-C who found that there were "several pink, hyperkeratotic papules to his bilateral forearms," and her impression was that Plaintiff had "prurigo nodularis." *Id.* She put Plaintiff on a daily skin care regimen and gave him a prescription for Protopic ointment. *Id.*

Dr. Emadian saw Plaintiff again on May 14, 2003 for "back pain radiating to the right > [*sic*] left hip and thigh." TR 148. Plaintiff was given the same diagnosis as on April 29, 2003, and Dr. Emadian informed Plaintiff "that surgical intervention does not portend good prognosis for satisfactory relief of his low back pain due to the degenerative disease." TR 149. Plaintiff, however, stated that "he can no longer continue with the current level of discomfort" and requested to have the surgery. *Id.* Plaintiff said he would "take [his] chances." *Id.* Dr. Emadian scheduled an "L2/3 microscopic lumbar diskectomy." *Id.*

On June 11, 2003, Plaintiff underwent the surgery by Dr. Emadian at Harton Regional Medical Center. TR 146. The surgery was performed with no complications. TR 147. Plaintiff's first post-operative follow-up appointment was on July 18, 2003. TR 144. Plaintiff stated that he was "pleased with the results of his surgery" and that he had "no residual right lower extremity symptoms." *Id.* Dr. Emadian found that Plaintiff's "residual symptoms are reminiscent of degenerative causes" and recommended "symptomatic treatment." TR 145.

Dr. Reeta Misra completed a Physical Residual Functional Capacity Assessment ("RFC") regarding Plaintiff on August 18, 2003. TR 123-128. Plaintiff could occasionally lift and/or

8

carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, and had unlimited abilities to push and/or pull. TR 124. Additionally, Plaintiff occasionally had postural limitations, but had no manipulative, visual, communicative or environmental limitations. TR 125-127.

Plaintiff saw Dr. Blankenship on October 10, 2003, for neck pain.[2] TR 202. Plaintiff returned to Dr. Blankenship on October 13, 2003 and October 15, 2003 for congestion, vomitting and green mucus.[3] TR 198-201.

On November 7, 2003, Plaintiff saw Dr. Emadian for "[b]ack pain radiating to the right leg." TR 141. Dr. Emadian noted that Plaintiff was undergoing chronic pain management and taking Lortab and Neurontin for his symptoms. *Id.* Plaintiff, however, stated that he obtained only moderate relief with his medication and that his post-operative back pain was in a different location from pre-surgery. *Id.* Plaintiff also stated that he had tried to return to work-related duties, "but his pain prohibited him from tolerating the duties." *Id.*

On December 17, 2003 Plaintiff saw Dr. Blankenship for possible flu, a cough, and runny nose.[4] TR 196.

On April 8, 2004, Plaintiff returned to Dr. Emadian complaining of "[b]ack pain radiating to the right leg." TR 139. Dr. Emadian noted that since his last visit Plaintiff had "received two separate epidural steroid injections" and was scheduled for a third one. *Id.* Plaintiff was diagnosed with "[p]ersistent lumbago and lumbar radiculopathy." TR 140.

On April 22, 2004, Plaintiff was treated by Dr. Emadian for persistent back pain. TR 137. Dr. Emadian reported no signifcant changes in Plaintiff's condition. *Id.* Plaintiff's

---

[2]Although the records from TR 165-213 do not have Dr. Blankenship's signature, the table of contents states that he was the treating physician. TR 3.
[3]The record from this visit is largely illegible. TR 200.
[4]The record from this visit is largely illegible. TR 196.

9

primary diagnosis was "[c]hronic lumbago, epidural fibrosis." *Id.* Dr. Emadian found that surgery was not an option and the continuation of "symptomatic" treatment was recommended. *Id.*

 On January 21, 2004, Plaintiff went to Dr. Blankenship complaining that his "stomach meds not helping." TR 194. Plaintiff requested refills of the medicine while stating that "protonix is not helping at all." *Id.* On February 18, 2004, Plaintiff was seen for a cyst on the inside of his leg.[5] TR 192.

On March 2, 2004, Plaintiff received an epidural at Stones River Hospital.[6] TR 158. On March 8, 2004, Plaintiff was seen by Dr. Blankenship for depression, for which he requested a medication refill.[7] TR 190. On March 16, 2004, Plaintiff received another epidural at L3-4. TR 156-157. The same procedure was performed again on November 2, 2004.[8] TR 156.

Plaintiff visited Centennial Medical Center on April 7, 2004 with a chief complaint of "Dyspnea" and "Severe aortic stenosis." TR 129. Dr. Webber's impression was that Plaintiff had "Critical aortic stenosis," "Chronic atrial fibrillation," "Chronic obstructive pulmonary disease," "Mild abnormality of thyroid function," "Mildly elevated protime despite discontinuing Coumadin last week," "Obesity," and "History of ischemic heart disease." TR 130. Dr. Webber planned to proceed with "right and left heart catheterization...with selective coronary arteriography and saphenous vein graft injection." *Id.* Additionally, Dr. Webber planned to "attempt to cross the heavily calcified and severely stenosed aortic valve." *Id.*

On April 14, 2004, Plaintiff was treated by Dr. Blankenship for complaints of the flu and anxiety. TR 188-189. Dr. Blankenship found that Plaintiff had anxiety. TR 189.

---

[5]The physician's notes are illegible. TR 192.
[6]The record from this visit is largely illegible. TR 158.
[7]The physician's notes are largely illegible. TR 190.
[8]The record from this visit is largely illegible. TR 156.

10

On April 23, 2004, Plaintiff was treated for a sinus infection and ear pain.  TR 186.

Plaintiff returned for check-ups of his sinus infection on May 7, 2004 and May 24, 2004.[9]  TR

182-185.  Plaintiff requested a medication refill on July 1, 2004.[10]  TR 180.

On July 14, 2004, Plaintiff was seen by Dr. Blankenship for a rash on his left foot that

was "tender to touch."  TR 178.  Dr. Blankenship noted that there was drainage and itching.[11]

Id.  Plaintiff had a follow-up appointment on July 21, 2004 where the doctor found that it had

"greatly improved."  TR 176-177.  On August 17, 2004, Plaintiff was seen for right knee

dermatitis and insomnia.  TR 174-175.  Plaintiff had a follow-up appointment on October 8,

2004, and Dr. Blankenship noted "long term use of Dep. Arthritis meds works well."[12]  TR 172.

On October 20, 2004, November 3, 2004, and November 8, 2004,  Plaintiff had

laboratory tests done by LabOne.  TR 205-208.  Plaintiff was seen by Dr. Blankenship on

November 1, 2004 for a follow-up "MRI cervical."[13]  TR 170.  On November 4, 2004, Plaintiff

had a follow-up "ABM" with Dr. Blankenship.  TR 168.  Dr. Blankenship noted that Plaintiff

"feels fine."[14]  Id.  On November 8, 2004, Plaintiff visited Dr. Blankenship  complaining of left

shoulder pain and was assessed to have  "paraspinal myoscitis."[15]  TR 165-166.

From March 11, 2003 to November 16, 2004, Plaintiff was treated by Dr. James E. Roth

with Paragon Pain Management.[16]  TR 214-261.  Plaintiff had a physical examination on March

11, 2003 for his back and knee pain.  TR 249.  It was noted that, six months prior, Plaintiff had

"picked up a horse trailer and heard back pop and fell to the ground."  Id.   Plaintiff complained

[9]A large portion of Dr. Blankenship's notes are illegible.  TR 182-185.
[10]The names of the medications and the physician's notes are illegible.  TR 180-181.
[11]The record of this visit is largely illegible.  TR 178-179.
[12]The majority of the physician's notes are illegible.  TR 172-173.
[13]The physician's assessment is illegible.  TR 170-171.
[14]The remainder of the physician's notes are illegible.  TR 168.
[15]Dr. Blankenship's other diagnoses are illegible.  TR 166.
[16]A summary of Plaintiff's pain medications can be found on TR 260-261.

11

that the "back pain radiates down...leg." *Id.* Dr. Roth assessed Plaintiff as having lumbar spinal stenosis. TR 257. He prescribed Plaintiff Celebrex, Baclofen, Lortab and Neurontin. TR 258-259. Plaintiff underwent another physical exam on March 18, 2003 where it was noted that his then-current medications included Promethazine, Hydro 7.5 and Nexium. TR 248. On March 27, 2003, Plaintiff had another physical examination.[17] TR 247.

On October 7, 2003, Plaintiff had a follow-up appointment to get a medication refill. TR 245. Plaintiff indicated that his spasm was "not responding to Baclofen's present dose." *Id.* Dr. Roth indicated that there was no change in the character of Plaintiff's pain. *Id.*

On November 4, 2003, Dr. Roth noted that the severity of Plaintiff's pain decreased with medication.[18] TR 243. On November 23, 2003, Plaintiff returned for a follow-up and medication refill. TR 240. Dr. Roth noted that Plaintiff's pain still decreased with medication and that his stomach was upset. *Id.* Plaintiff's follow-up appointment on December 23, 2003 also revealed no change in the character of Plaintiff's pain; Plaintiff did, however, have a cough with "sputum." TR 238.

Plaintiff returned to Dr. Roth on January 20, 2004 seeking medication refills for his lower back pain. TR 236. Dr. Roth noted that there was no change in the character of his pain, that the pain decreased with medication, and that Plaintiff had abnormal ear canals. *Id.*

On February 17, 2004, Plaintiff had another follow-up appointment, and it was noted that Plaintiff had no change in the character of his pain. TR 234.

Plaintiff had laboratory tests done at LabOne on March 2, 2004. TR 232. On March 16, 2004, Plaintiff had a follow-up appointment with Dr. Roth for his continued pain. TR 230. Dr.

---

[17]The physician's notes are illegible. TR 247.
[18]On November 6, 2003, Plaintiff had a pulmonary follow-up; however, the physician's notes are illegible. TR 242.

12

Roth noted that there was no change in the character of Plaintiff's pain, but that the pain had continued to decrease with medication. *Id.*

Dr. Roth indicated on April 20, 2004 that Plaintiff's medications were working well and that Plaintiff had undergone a spine MRI the previous week. TR 228.

On May 18, 2004, Dr. Roth noted that the nature of Plaintiff's pain had remained unchanged and that the medication decreased the severity of the pain. TR 226. The same characteristics were noted during the next follow-up, on June 29, 2004. TR 224.

Plaintiff underwent a quarterly review on August 24, 2004 where it was noted that he experienced new or different symptoms of shoulder pain and that he "has not been able to return to work." TR 220. From September 2004 until November 2004, Dr. Roth noted no changes in the character of Plaintiff's pain. TR 214-218.

### B. Plaintiff's Testimony

Plaintiff was born on April 11, 1966, and has an 8th grade education. TR 278. Plaintiff testified that he could barely read and could not write, but could spell his name. *Id.* Plaintiff stated that he could not write a letter to a relative or friend. TR 279. When asked about how much he could read, Plaintiff stated: "I mean, just barely enough to be able to pay my bills...more or less seeing how much they are and paying them." *Id.* Plaintiff stated that he had his driver's license, which he obtained by having the questions read to him. *Id.* Plaintiff went on to say that he did not really read road signs and stayed "in Woodbury mostly." *Id.* Plaintiff testified that he had trouble finding places if he left Woodbury. TR 280. Plaintiff testified that he could not read a map and had had someone else drive him to the hearing. TR 279-280. Plaintiff explained that his Social Security forms were read to him and filled out by someone else. TR 280.

Plaintiff testified that he lived alone in a trailer and was behind on his rent. TR 280-281. He stated that he had been behind on his rent since his back injury. TR 281. Plaintiff explained that he received $146 in food stamps per month from the government. *Id.* He went on to explain that he did not own any property, but did own a truck which he estimated was worth $500. *Id.* Plaintiff stated that he had never been married, but had one son for whom he paid $35 per week in child support. *Id.* Plaintiff testified that he was also behind on his child support, but that he did not know how much he was behind. TR 282. Because of this, Plaintiff explained that he had to go to court for hearings about what he owed in child support. *Id.*

When asked about his medication, Plaintiff reported that he took the following medications: Hydrocodone, Beclason, Neurontin, Zocor, and Nexium. TR 282. Plaintiff testified that one side effect of the medications was that they made him sleepy, but he noted that he slept very little during the day. TR 282-283. When asked about his night sleep habits, Plaintiff responded: "I have problems because of my back. I take one kind of pill to help me sleep at night." TR 283. Plaintiff testified that the Hydrocodone helped with his pain and he stated: "Sometimes I take a little extra, you know, I want extra or something – ease it down a little where I can do something." *Id.*

When asked about the disabilities that keep him from working, Plaintiff stated that he had back pain and problems in his left kneecap. TR 283. He explained that his knee pain had been going on for four years, but he had never had surgery. TR 284. Plaintiff testified concerning what the doctors had told him was wrong with his knee:

> [T]hey say it's gotten arthritis built up in it, and the kneecap itself it [*sic*] broke. It's an old break, and they say it won't never heal back. So I will have to have knee surgery on it.

*Id.* Plaintiff stated that the problem with his knee was that it "pops out to the side and it hurts

14

real bad inside there" and that if he put pressure on it when he walked, "it feels like it pops out." *Id.* He reported that it "sort of gives out." *Id.* Plaintiff testified that the pain in his knee occurred "at least" two or three days a week. *Id.* On a scale of one to ten, with ten being most severe, Plaintiff described his knee pain as about a five to an eight with his medication. TR 284-285.

Plaintiff stated that he has difficulty getting back up from squatting because of both his back and kneecap pain. TR 285. Plaintiff testified that he was not at work when he injured his back "[t]rying to pick up the front of a horse trailer." *Id.* Plaintiff explained that he had not been back to work since his injury. TR 285. Plaintiff went on to state:

> Well, I thought I'd take off for a week or so to let my back – it started to pull a muscle. That's what I felt, and it didn't get no better and stuff. So, I never did get to go back to work.

TR 285. Plaintiff stated that he was not then-currently working. TR 286.

Plaintiff testified that he had undergone back surgery, but that when he asked his doctor about having additional surgery, he was told "that it be best [*sic*] not to do it, because it could come back with a vengeance." TR 286. Plaintiff went on to say that his doctor did not discuss limitations with him during their most recent conversations. TR 286-287. Plaintiff stated: "Just more or less told me to do whatever I felt like I was able to do." TR 287.

Plaintiff testified that he sees "Dr. Raul" [*sic*] once a month at the pain management clinic. TR 287. Plaintiff described these visits:

> Sometimes when I first started seeing him [*sic*], he started them steroid shots in my back and everything. And they wasn't helping or nothing. They make me sick in my stomach. So they don't do them no more. Then that's about the only thing besides giving my pain medication and muscle relaxers that – he put me through a therapist one time, you know, over there and that helped for a little while. You know, but not – it didn't really kill the pain.

15

TR 287.  Plaintiff testified that he wore the back brace given to him by Dr. Emadian "about every day."  *Id.*  Plaintiff was asked if he was able to sit during the entire hour and a half while he was waiting for the hearing to start.  TR 287-288.  Plaintiff responded that he was not able to do so;  he had had to stand up, walk around, sit back down, and he had wanted a place to lie down because he "hurt so bad."  TR 288.  Plaintiff went on to explain that he believed that he could sit for 30 minutes before he would have to "get up and move around."  *Id.*  Plaintiff stated that, although he could stand for about an hour, the pain never goes away.  *Id.*  Plaintiff was asked about how far he could walk without having problems in his back or legs.  *Id.*  Plaintiff testified: "I want to say probably 30, 40 yards and my back gets hurting and my leg is hurting...I usually have to find a place to sit down if I go much longer than that."  TR 288-289.

Plaintiff stated he had difficulty stooping, and that if he bent over, "it hurts to straighten back up."  TR 289.  Plaintiff stated that, when he tied his shoe, it felt "like somebody is stabbing me in the back with a knife."  *Id.*  When asked how much he could lift, Plaintiff testified: "I'm going to say ten pounds without really making it hurt."  *Id.*  On a scale of zero to ten, with ten being the most severe, Plaintiff classified his back pain as about seven or eight with medication.  TR 289-290.  Plaintiff stated that his back pain would be "probably unbearable" without medication.  TR 290.

When asked to describe a typical day, Plaintiff testified that he would clean the house by himself, but that he could hardly wash dishes because standing up hurt so bad.  TR 290.  He also stated that he took care of his two or three horses and "dozen or so" chickens, but that he would have to get rid of them because of his back.  *Id.*  Plaintiff explained that when he walked to the barn, he would have to stop before he got there and sit down.  TR 291.  Additionally, Plaintiff stated that his nephew helped him take care of the chickens and horses.  *Id.*  Plaintiff testified

16

that he spent about five or six hours inside the house every day and that he had to lie down. *Id.*

Plaintiff was working at Wolfe Trees when he hurt his back. TR 291. At Wolfe Trees, he used a chainsaw, cut trees and filed brush. *Id.* Plaintiff described the work as heavy, and stated that he lifted about 20 or 25 pounds with the chainsaw. TR 292-293. Plaintiff testified that he "had to cut the trees down and roll them down the hill all the right way of [*sic*] the lines," and that he lifted about "4 or 500 pounds [*sic*]" at the heaviest when doing so. *Id.* Plaintiff stated that the easiest thing he did on that job was to fill the chainsaw with gasoline. *Id.* He stated that he worked about ten hours a day. *Id.*

Plaintiff explained that at his job prior to Wolfe trees he drove a "little bitty," a small pickup truck with a chipper behind it.[19] TR 293. He used this to cut trees that were hanging across the road, mostly in the country. *Id.* Plaintiff stated that he also tarred and chipped the road and ran the oiler and shot out oil. *Id.* Plaintiff testified that this job required bending, stooping and lifting. *Id.* When asked about lifting, Plaintiff stated:

> I had to lift 16 foot arms where you had to let the arms down to shoot the whole road. I had to raise them up and raise them down [*sic*] every day. I had – later we had to pull the whole spraying system up off the road.

TR 293. Plaintiff described this work as medium. *Id.*

Plaintiff also stated that he worked for Kilford's Lumber Mill where he sawed cedar, shoveled sawdust, and stacked lumber and cedar posts. TR 294. Plaintiff stated that he had to lift anywhere between 30 and 150 pounds. *Id.* Plaintiff further stated that none of the previous jobs had required him to read or write. *Id.*

Plaintiff testified about his work at Crane Interior where he "had to pull the covers over the Styrofoam seats" for boats. TR 294. Plaintiff stated that this job had been rough on his

---

[19]The name of his previous employer was inaudible. TR 292.

fingers and back.  *Id.*  Plaintiff testified that none of his jobs had required any particular skills or

training.  TR 295.  He testified that, at the time of the hearing, he would not be able to do any of

those jobs, and he was unaware of a job that he would be able to do at that time.  *Id.*

Plaintiff had worked another job where he made CD "holders" that was similar to an

assembly line type job.  TR 300.  At that job, Plaintiff testified that he cut the wood that came in

pieces of lumber, smoothed one side, and measured how wide the boxes needed to be.  *Id.*

Plaintiff stated that he stood up for his entire shift.  *Id.*  Plaintiff explained that he would

sometimes work both dayshift and nightshift.  *Id.*  Additionally, Plaintiff testified that the job

had required him to bend, stoop, and lift anywhere from 10 to 100 pounds.  TR 301.  Plaintiff

reported that he quit that job after one year to make more money.  *Id.*  Plaintiff stated that, at the

time of the hearing, he did not believe that he could perform the job because he would have

difficulty bending over, twisting and lifting.  *Id.*

The ALJ asked Plaintiff about his daily activities.  TR 296.  Plaintiff testified that he did

not "do a whole lot," but that he would spend time in the house, talk outside with his father, and

go to the store.  TR 296-297.  Plaintiff stated that his hobbies used to be hunting and riding

horses, but that he could no longer do either.  TR 297.  Plaintiff reported that he had tried to hunt

the previous year, but stated, "I couldn't even walk to my tree stand.  I had to stop before I go

[*sic*] there and sit right behind my grandmother's house to hunt across the fields she's got there."

*Id.*  Plaintiff explained that it had been a "little over two years" since he had last ridden a horse.

*Id.*  Plaintiff stated that he smoked and occasionally drank alcohol.  TR 297-298.

### C.  Vocational Testimony

Vocational expert ("VE") Gail Ditmore also testified at Plaintiff's hearing.  TR 298.

The VE testified that Plaintiff's past relevant work as a tree trimmer/helper would be

18

classified as medium and unskilled with an SVP of 2 by the DOT. TR 302. The VE, however, stated that it would be more accurately described as heavy. *Id.* The VE also testified that Plaintiff's past relevant work as a tow motor operator would be classified as medium, on the low-end of semi-skilled, with an SVP of 3 and no transferrable skills. *Id.* The VE indicated that Plaintiff's past relevant work as a sawmill worker would be classified as medium and unskilled with an SVP of 2, but noted that Plaintiff performed the job at the heavy level. TR 302-303. The VE indicated that Plaintiff's work for the highway department of labor was normally performed at the very heavy level; however, Plaintiff performed it at the medium unskilled level with an SVP of 2. TR 303. Plaintiff's work making woodcuts for the CD holders was classified as heavy and unskilled with an SVP of 2. *Id.*

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff and asked if the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past. TR 303. The VE answered that the hypothetical claimant could perform light level work based on the results from a consultative examination by Dr. Keown. TR 304, 117-118. Based on the RFC results, however, Plaintiff could perform medium work. TR 304, 123-128. The VE stated that if the light level of exertional capacity was applied, Plaintiff could not perform any previous jobs, but if the medium level was applied, then Plaintiff could perform all past work except for the highway worker and the woodworking laborer. TR 304-305.

The ALJ modified the hypothetical to include a 10 pound lifting limit, no ability to squat, no competitive or continuous bending or stooping and a required sit/stand option. TR 305. The VE testified that that would allow a limited range of sedentary work. *Id.* The VE opined that, in the State of Tennessee, there were approximately 5,400 sedentary unskilled assembler positions, 1,084 production workers, 338 hand packer positions, and 371 inspector positions, all of which

19

would be appropriate for the hypothetical claimant. TR 305-306. The ALJ then proposed a hypothetical where a person could lift 20 pounds on an occasional basis and 10 pounds frequently. TR 306. The VE classified this person as capable of performing light work, and testified that there were numerous other positions that would be appropriate for the hypothetical claimant, including 11,547 assembler positions, 1,626 production worker positions, and 5,517 hand packer positions, at the light level. *Id.* The VE testified that, if a person had less than moderate pain on average, that individual could work at that level of pain, but that if the pain was greater than moderate on an ongoing basis, work would not be possible. TR 307.

### III. CONCLUSIONS OF LAW

#### A. Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*,

20

745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson*, 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

(1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

(2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[20] or its equivalent. If a listing is met or equaled, benefits are owing without further inquiry.

(4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations). By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5) Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added). *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with

---

[20]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony.  *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere.  *See* 42 U.S.C. § 423(d)(2)(B).

### C.  Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred in (1) giving more weight or controlling weight to the findings of Dr. Misra and Dr. Keown over those of Plaintiff's treating physicians; (2)  finding that Plaintiff's subjective complaints of functional limitations were not fully credible; (3) finding that Plaintiff did not have an impairment that met or equaled a listing; (4) giving and utilizing flawed hypotheticals to the VE; and (5) determining that Plaintiff, (a) retained an RFC of medium, (b) could return to some of his past relevant work, and (c) was not disabled.  Plaintiff also contends that the ALJ erred by not completing the five-step sequential analysis and not explaining his finding that there were a significant number of jobs available for Plaintiff in the national economy.  Docket Entry No. 10.  Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed.  *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

Case 3:05-cv-00983   Document 14   Filed 07/16/07   Page 23 of 32 PageID #: 76

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

### 1. Weight Accorded to Medical Opinions

Plaintiff maintains that the ALJ erred in giving more weight or controlling weight to the findings of Dr. Misra and Dr. Keown rather than to those of his treating physicians. Docket Entry No. 10.

The ALJ, in his opinion, comprehensively discussed the findings of Drs. Webber, Portilla, Arms, Keown, Olafsson, Emadian, Goolsby, Bounds, and Misra. TR 14-19. With regard to Dr. Misra, the ALJ discussed Dr. Misra's findings, found them to be "consistent with the evidence," and adopted them in their entirety. TR 15-17. The ALJ further noted, *inter alia,* that, "Dr. Misra's evaluation is supported by the claimant's daily activities and the objective medical evidence which shows that his major lumbar spinal problem was successfully corrected by surgery." *Id.* With regard to Dr. Keown, the ALJ discussed her findings thoroughly, and stated, *inter alia*: "Dr. Keown's opinions regarding the quality of effort during the consultative evaluation and the claimant's actual capacities support Dr. Misra's opinion that he can perform at a level greater than claimed." *Id.* When discussing the evidence and the findings of each physician, the ALJ also reviewed Dr. Emadian's findings in great detail. Specifically, the ALJ stated, *inter alia*:

On February 21, 2003, Seyed Emadian, MD, noted that the claimant had 5/5 strength in all muscle groups, full sensation, normal reflexes, normal heel, toe and tandem gait, negative straight leg raising, and negative crossed straight leg raising (Ex. 11F-19). Dr. Emadian noted that MRI scans showed evidence of degenerative disc disease. The claimant saw Dr. Emadian a number of times and on June 11, 2003, Dr. Emadian performed a lumbar diskectomy at L2-3 (Ex. 11F-10). Following the back surgery, on July 18, 2003, Dr. Emadian noted the claimant was making good progress (Ex. 10F-9). Dr. Emadian did not recommend further surgery on November 7, 2003. . . .

On April 22, 2004, Dr. Emadian assessed that the claimant had epidural fibrosis from his previous surgery, but did not recommend further surgery (Ex. 11F-1).

TR 15-16.

The detailed, articulated rationale in the ALJ's decision demonstrates that he carefully considered the findings of Drs. Webber, Portilla, Arms, Keown, Olafsson, Emadian, Goolsby, Bounds, and Misra. There is no evidence whatsoever that the ALJ discounted the opinions of Plaintiff's treating physicians or that he gave greater weight or controlling weight to the opinions of Drs. Misra and Keown.

## 2. Credibility

Plaintiff contends that the ALJ erred in finding that his subjective allegations of functional limitations were not fully credible. Docket Entry No. 10.

The Sixth Circuit has set forth the following criteria for assessing a plaintiff's subjective allegations of disabling symptoms:

[S]ubjective allegations of disabling symptoms, including pain, cannot alone support a finding of disability...[T]here must be evidence of an underlying medical condition *and* (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition *or* (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

*Duncan v. Secretary*, 801 F.2d 847, 853 (6th Cir. 1986) (*quoting* S. Rep. No. 466, 98th Cong., 2d

Sess. 24) (Emphasis added); *see also* 20 C.F.R. §§ 404.1529, 416.929 ("[S]tatements about your

pain or other symptoms will not alone establish that you are disabled...."); and *Moon v. Sullivan*,

923 F.2d 1175, 1182-83 ("[T]hough Moon alleges fully disabling and debilitating

symptomology, the ALJ, may distrust a claimant's allegations...if the subjective allegations, the

ALJ's personal observations, and the objective medical evidence contradict each other."). 

Moreover, "allegations of pain...do not constitute a disability unless the pain is of such a

debilitating degree that it prevents an individual from engaging in substantial gainful activity."

*Bradley v. Secretary*, 862 F.2d 1224, 1227 (6th Cir. 1988).

When analyzing the claimant's subjective complaints of disabling symptoms, the ALJ

must also consider the following factors and how they relate to the medical and other evidence in

the record: the claimant's daily activities; the location, duration, frequency and intensity of

claimant's pain; the precipitating and aggravating factors; the type, dosage and effect of

medication; and the other treatment or measures to relieve pain.  *See Felisky v. Bowen*, 35 F.3d

1027, 1039 (6th Cir. 1994) (*construing* 20 C.F.R. § 404.1529(c)(2)).  After evaluating these

factors in conjunction with the evidence in the record, and by making personal observations of

the claimant at the hearing, an ALJ may determine that a claimant's subjective complaints of

pain and other disabling symptoms are not credible.  *See, e.g., Walters v. Commissioner,* 127

F.3d 525, 531 (6th Cir. 1997); *Blacha v. Secretary*, 927 F.2d 228, 230 (6th Cir. 1990); and *Kirk v.

Secretary,* 667 F.2d 524, 538 (6th Cir. 1981).

In the instant case, the ALJ found that Plaintiff's allegations of functional limitations

were not fully credible.  TR 17.  Specifically, the ALJ articulated that Plaintiff had "normal

physical exams" and that the overall evidence showed that his degenerative disc disease was

26

"generally mild." *Id.* The ALJ further articulated:

> Daily activities acknowledged during the hearing include drinking, smoking, driving, raising a son (non-custodial parent), house cleaning, washing dishes, caring for two to three horses and 12 chickens, being outside, shopping, visiting with his father, and deer hunting, although the claimant stated he couldn't deer hunt this past year. The documentary record shows these additional daily activities: visiting with his sister, shopping for groceries, vacuuming, washing clothes, and walking (Ex. 5E).
>
> The claimant alleges that the symptoms preclude sitting more than 30 minutes, standing more than 60 minutes, walking more than 30 to 40 yards, lifting more than 10 pounds, and that he can only bend a little and that stooping is difficult. However, daily activities in the record do not support these alleged limitations.

TR 17.

The ALJ also listed all of Plaintiff's medications including Nabumetone, Baclofen, Amitriptyline, Trazodone, Bupropion, Gabapentin, and Zocor. TR 15. The ALJ recognized that Plaintiff indicated no medicinal side effects and that Plaintiff used a back brace for non-medicinal symptom control. *Id.* As can be seen, the ALJ's decision specifically addresses in great detail not only the medical evidence, but also Plaintiff's testimony and his subjective claims, indicating that these factors were considered. *Id.* It is clear from the ALJ's detailed articulated rationale that, although there is evidence which could support Plaintiff's claims, the ALJ chose to rely on medical findings that were inconsistent with Plaintiff's allegations. This is within the ALJ's province.

The ALJ, when evaluating the entirety of the evidence, is entitled to weigh the objective medical evidence against Plaintiff's subjective claims and reach a credibility determination. *See, e.g., Walters,* 127 F.3d at 531; and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981). An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and

credibility.  *Walters,* 127 F.3d at 531 (*citing Villarreal v. Secretary,* 818 F.2d 461, 463 (6th Cir.

1987)).  Discounting credibility is appropriate when the ALJ finds contradictions among the

medical reports, the claimant's testimony, the claimant's daily activities, and other evidence.

*See Walters*, 127 F.3d at 531 (*citing Bradley,* 682 F.2d at 1227; *cf King v. Heckler*, 742 F.2d 968,

974-75 (6th Cir. 1984); and *Siterlet v. Secretary*, 823 F.2d 918, 921 (6th Cir. 1987)).  If the ALJ

rejects a claimant's testimony as not credible, however, the ALJ must clearly state the reasons

for discounting a claimant's testimony (*see Felisky*, 35 F.3d at 1036), and the reasons must be

supported by the record (*see King*, 742 F.2d at 975).

 After assessing all the objective medical evidence, the ALJ determined that Plaintiff's

subjective allegations of functional limitations were not credible.  TR 18.  As has been noted,

this determination is within the ALJ's province.

 The ALJ observed Plaintiff during his hearing, assessed the medical records, and

reached a reasoned decision; the ALJ's findings are supported by substantial evidence and the

decision not to accord full credibility to Plaintiff's allegations was proper.  Therefore, this claim

fails.

### 3.  Listing 1.04, Disorders of the Spine

 Plaintiff argues that the ALJ erred in finding that he did not have a disorder that met or

equaled a listing.  Docket Entry No. 10.  Plaintiff specifically argues that he should have been

found disabled under Listing 1.04 because: "There was evidence from Dr. Emadian that Plaintiff

had a herniated disc at L2/3"; "There was evidence of lumbar radiculopathy from nerve root

impingement, significant epidural fibrosis"; and "There was pain distribution and limitation of

motion in the spine."  *Id.*

 Listing 1.04, states as follows:

1.04, *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.

With:

A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

B.  Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

In order to meet or equal a listing, Plaintiff bears the burden of demonstrating, via acceptable clinical and diagnostic techniques, that all of the specified requisite medical criteria are present. 20 CFR § 404.1525(d). Additionally, Plaintiff's ailments must be expected to last a minimum of twelve continuous months.  20 CFR § 404.1525(c)(4); 42 U.S.C. § 423(d)(1)(A).

Although Plaintiff was found to have degenerative disc disease and epidural fibrosis at L2/3, both the pre and post surgical examinations by Dr. Emadian did not reveal any sensory abnormalities, muscle weakness, or significant reflex abnormalities. *See* TR 139-155. Furthermore, Drs. Emadian, Keown, and Blankenship found Plaintiff's straight leg raising tests to be  negative.  TR 118, 155, 169.  Finally, although Plaintiff was diagnosed with "mild" spinal stenosis, a "mild" spinal condition is inconsistent with the requisite level of severity in the

29

Listings.  Accordingly, the ALJ was correct in his determination that Plaintiff's ailments do not meet or equal a Listing.

### 4.  Hypotheticals Posed to the VE

Plaintiff argues that the hypotheticals posed to the VE "were not based upon precise information in the records," because they were based upon Dr. Misra's assessment, which Plaintiff argues was unreliable.  Docket Entry No. 10.  Plaintiff asserts that the "hypothetical questions posed to the expert must reflect 'precisely' the specific exertional and nonexertional limitations of the particular claimant."  *Id.*    Plaintiff is correct that the proffered hypotheticals must include Plaintiff's exertional and nonexertional limitations; the hypotheticals, however, need only include the evidence which the ALJ deems credible.  *See, e.g, Cline v. Shalala,*96 F.3d 146, 150 (6th Cir. 1996).

As has been discussed, the ALJ properly deemed Dr. Misra's assessment to be credible. Because the ALJ found Dr. Misra's assessment to be credible, he was entitled to use the information from that assessment in his hypotheticals.  *See Cline, supra*.  The ALJ appropriately proffered hypotheticals representing Plaintiff's limitations (both exertional and nonexertional) using information that he found credible; accordingly, the ALJ's hypotheticals were proper.  *See, e.g., Cline, supra; Varley*, 820 F.2d at 779.

### 5.  RFC Determination, Past Relevant Work, and Finding of "Not Disabled"

Plaintiff argues that the ALJ erroneously determined that Plaintiff, (1) retained an RFC for medium work; (2) could return to some of his past work; and (3) was therefore not disabled. Docket Entry No. 10.  Plaintiff argues that he cannot, in fact, do any of his past relevant work. *Id.*  After evaluating all of the evidence, however, the ALJ determined that Plaintiff retained an RFC for medium work and could therefore perform his past relevant work as a "tree trimmer

30

helper, saw mill worker, and tow motor operator." TR 18. The ALJ excluded Plaintiff's prior jobs as laborer, including his past work with the highway department (very heavy) and making the woodcuts for CD holders (heavy, unskilled, SVP 2). TR 14, 303, 305. Step four of the five-step sequential analysis states: "If the claimant's impairment (or impairments) does not prevent him from doing his past relevant work, he is not disabled." 20 CFR §§ 404.1520 and 416.920. As has been discussed, the ALJ found that Plaintiff was able to perform some of his past relevant work. TR 17. Because the ALJ found that Plaintiff could return to some of his past work, the ALJ properly determined that Plaintiff was "not disabled" under the Regulations.

Plaintiff also contends that the ALJ erred when he concluded that there were a significant number of jobs in the national economy that would be appropriate for Plaintiff, but did not explain or support the basis for this finding. Docket Entry No. 10. Because Plaintiff was "not disabled" at step four, it was unnecessary for the ALJ to proceed to step five and consider whether "other work exists in significant numbers in the national economy that accommodates [Plaintiff's] residual functional capacity and vocational factors." 20 CFR §§ 404.1520 and 416.920. Because the ALJ did not need to proceed to step five of the sequential analysis, the ALJ was not required to "explain or support the basis" for a determination that there were a significant number of jobs in the national economy that would be appropriate for Plaintiff.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt

31

of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

_____
E. CLIFTON KNOWLES
United States Magistrate Judge